## Elkhorn Consolidated Coal & Coke Company v. Eaton, Rhodes & Company.

(Decided March 3, 1915.)

## Appeal from Boyd Circuit Court.

1. Contracts—Mutuality.—Where a coal company contracts with a commission broker for the exclusive sale of its output of coke, so long as the services of the broker are satisfactory, and agrees that no one other than the broker shall quote on the product, and the broker agrees to keep the coal company supplied with orders at good prices, to bill and collect for the coke sold, and to guarantee the payment of all accounts, such contract is not void for want of mutuality.

2. Principal and Agent—Contract—Termination.—A contract whereby a coal company agrees that a commission broker shall have the exclusive sale of its product of coke so long as its services are satisfactory to the coal company, in consideration of the broker's agreeing to keep the company supplied with orders at good prices, to bill and collect for coke sold and to guarantee all accounts, is a contract that may be terminated by either party.

3. Principal and Agent—Revocation of Authority—Notice.—An agency contract whereby a commission broker is to have the exclusive sale of the entire coke output of a coal company so long as the broker's services are satisfactory, requires notice of its termination by either party, and is not terminated by the coal company's contracting directly with persons other than the broker for the sale of its product, in violation of its contract with the broker.

4. Principal and Agent—Recovery of Commissions—Evidence.— The instructions being proper, held under the evidence that a broker who, under a contract, had the exclusive sale of a coal company's product of coke so long as the broker's services were satisfactory, was entitled to recover commissions for coke sold

by the coal company direct to persons other than the broker, in violation of the contract and before its termination.

5. Principal and Agent—Breach of Contract—Instructions.—Under a contract whereby a broker is to have the exclusive sale of a coal company's product of coke so long as its services are satisfactory to the company, the coal company agreeing that no one other than the broker shall quote on the product, an instruction under which the mere quoting of prices is a breach of the contract is not erroneous where the quoting of prices results in an actual sale.

ELMER D. STEPHENSON, RICHARD D. DAVIS and SIMEON S. WILLIS for appellant.

PROCTOR K. MALIN for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

The Elkhorn Consolidated Coal & Coke Company is a corporation operating a coal mine and coke oven in Pike County. Eaton, Rhodes & Company is a firm of Cincinnati brokers, engaged in the business of handling pig iron, coal, coke, etc., on commission. The product of coke ovens, coal mines and blast furnaces is largely sold through brokers and sales agents. Prior to the completion of its ovens in July, 1911, a representative of Eaton, Rhodes & Company visited the coal company for the purpose of obtaining the privilege of selling its coke output. The negotiations led up to a contract by which the coal company's entire output of coke was placed in the hands of Eaton, Rhodes & Company for the purpose of sale. The contract was concluded by correspondence, and its terms are fully set forth in the following letters:

"Pikeville, Ky., May 25th, 1911.

"Messrs. Eaton, Rhodes & Co., Cincinnati.

"Gentlemen:—Your Mr. Layne was in Pikeville last week to see us about the selling of the output of The Elkhorn Cons. Coal & Coke Co.'s make of coke.

"I suggested to him that we might place the sale of our coke in your hands so long as your services were satisfactory to us, and you were getting the right prices for our coke. In other words, we desire to test your ability to handle our coke. He expressed himself as greatly pleased to take the sale of our coke upon that

basis. I have advices from Mr. Gorley, of the Marrow-bone Coal & Coke Co., and have considered the matter with my brother, who is vice-pres. of our company. We have decided to place the coke in your hands for sale accordingly. You will please write us a letter stating commissions charged and time of remittance and arrange orders for us. We will be shipping about the first of July.                    Very truly yours,

FON ROGERS."

Eaton, Rhodes & Company, in response to the above letter, wrote:

"Cincinnati, May 31st, 1911.

"The Elkhorn Consolidated Coal & Coke Co.,
          Pikeville, Ky.

"Gentlemen:—It is our understanding that you are to place in our hands the exclusive sale of your entire output of coke, and that you will not permit any one else to quote on this product, so long as we are able to demonstrate our ability to handle this matter for you.

"In consideration of our disposing of this product we are to receive the following commissions:

"On furnace coke at less than $3.00 per ton f. o. b. cars ovens, 10c per ton.

"On furnace coke at $3.00 per ton and over 5% commission.

"On foundry coke, a straight commission of 15c per ton.

"We to bill and collect, remitting to you on the 20th of each month following shipment.

"If this is in accordance with your understanding, and as a matter of future reference, please sign and return to us for our files a copy of this letter.

Yours truly,
"EATON, RHODES & COMPANY,
"J. C. LAYNE, JR."

This letter was accepted, endorsed and returned, accompanied by another letter, as follows:

"June 3rd, 1911.

"Eaton, Rhodes & Co., Cincinnati.

"Gentlemen:—We have your letter of the 31st May, relative to sale contract covering the production of our coke plant. We are signing your letter referred to, but

in doing so we understand you will keep us supplied with orders at good prices, and understanding this way, we accept your terms. We further understand that you guarantee to us all accounts; that is, when we sell coke on your order the matter of collecting is entirely with you, our net amount being guaranteed by you.

"As to price, we feel we should have a good price for our foundry, say $2.50, and $1.75 for our furnace coke. We would like to have orders for about 150 tons of coal daily, to net us 90c or over. We will be running the first of July, and by the fifth of the month will be making good coke.

Very truly yours,
"ELKHORN CONS. COAL AND COKE CO.,
By FON ROGERS, President."

The terms of the above letter were accepted by the following letter:

"June 5th, 1911.

"Mr. Fon Rogers, President,
"The Elkhorn Cons. Coal & Coke Co.,
"Pikeville, Ky.

"Dear Sir:—We beg to acknowledge receipt of your favor of the 3rd with acceptance of our letter of the 31st ult.

"We believe your position in regard to our guaranteeing the net amount is well taken, and we hereby agree to this arrangement—settlements to be made between the 20th and 25th of the month following shipment.

"We are inclined to think that we can secure the prices you mention for Foundry and Furnace Coke; these figures, of course, are subject to our commission; that is, $2.35 net for Foundry and $1.65 net for Furnace. We have in sight some business now which we will probably be able to close up in the course of a week or ten days, which will take care of about 50 tons daily of Furnace Coke for the last half of the year; when we say 50 tons per day, we mean 350 tons per week, and not 300 tons. Of course, you would have to ship a little over 50 tons daily to make up for the non-shipment Sundays.

"Regarding coal, we also have in sight some business which will probably take care of 400 to 600 tons per week of crushed coal, but we do not believe, in view of the general situation, that we can secure your price of

90c net. We think it likely, however, that we can get 80c net and an outside possibility of 85c. We understand very thoroughly that you will not be in shape to ship any coke before the first of July. If you can furnish any crushed coal for June shipment at 80c net, please advise immediately.

"In any event, we will ask you to reply to this letter by return mail, and in the future will be greatly obliged if you will state clearly in your letters and telegrams if the prices which you mention are net or subject to commission. It would probably be well to have a general understanding on this subject, so that there will be no chance for mistake. Yours truly,

"EATON, RHODES & CO."

Soon thereafter Eaton, Rhodes & Company began to advertise the coke to be manufactured by the coal company, and to take steps to establish a market therefor. On July 3, 1911, the firm made a contract for the delivery to the Ashland Iron & Mining Company of 1,500 tons of coke a month from July 15th to December 31, 1911, at $1.85 a ton. In October, 1911, the firm contracted with the Ashland Iron & Mining Company for the delivery, during the year 1912, of approximately 450 tons a week at $1.85 a ton. These contracts netted the coal company $1.75 a ton, after deducting the firm's commissions. In addition to these sales the firm made sales of furnace coke to other parties, and also of foundry coke, but it was soon demonstrated to the satisfaction of both the coal company and the firm that the coke which was being manufactured was not suitable for foundry purposes, but only for furnace purposes. The firm kept the coal company supplied with orders for all the coke which they could make or did make from the beginning of its operation. When, because of accidents to their furnaces, the Ashland Iron & Mining Company was unable to take the coke contracted for, the firm made sales thereof to other parties. These sales were made for the best prices obtainable in the market. On several occasions during this period the coal company was unable to furnish all the coke required by the orders and contracts made by the firm, and in 1912 did not manufacture or furnish a sufficient amount of coke to fill orders covered by the contracts of the Ashland Iron & Mining Company.

It appears that it is customary for blast furnaces to make their contracts for coke some time in advance of delivery. In May, 1912, while the firm was negotiating with the Ashland Iron & Mining Company for the output of the coal company's coke for the year 1913, the coal company quoted prices upon its coke direct to the Ashland Iron & Mining Company, and thereafter contracted with that company to supply it 100 tons of coke a day, beginning January 1st, 1913, and continuing until December 31, 1913, with the right on the part of the Ashland Iron & Mining Company to terminate the contract on 60 days' notice. Had the coal company not quoted the prices to the Ashland Iron & Mining Company, and contracted with it for the year 1913, that company would have purchased its coke from the coal company through the firm of Eaton, Rhodes & Company. The coal company claims that it verbally notified the firm that its contract with them was terminated. The members of the firm deny that any such notice was given. During the first six months of 1913 the coal company shipped to the Ashland Iron & Mining Company 9,997 tons of coke. During that year the coal company had in operation 60 ovens. Their capacity was about 2,500 tons a month. The average shipments during the year were from 2,100 to 2,200 tons. Of this they delivered to the Ashland Iron & Mining Company the 9,997 tons, and the remainder to other parties to whom they sold direct.

At the close of the year 1912 there was due from Eaton, Rhodes & Company to the coal company the sum of $5,162.41. This sum Eaton, Rhodes & Company declined to pay until the question of damages growing out of the coal company's alleged breach of its contract with them was adjusted.

This action was brought by the coal company to recover the above sum of $5,762.40. Eaton, Rhodes & Company set up the agency contract and counter-claimed for damages in the sum of $5,200. On the trial before a jury they were allowed damages in the sum of $1,200, and the coal company given judgment for the sum of $4,562.40. The coal company appeals.

1. It is first insisted that the contract lacks mutuality, and is, therefore, not enforceable. It will be observed that the coal company agreed that Eaton, Rhodes & Company should have the exclusive sale of the coal company's output of coke so long as their services were

satisfactory to the coal company and they demonstrated
their ability to handle the same.  During that time the
coal company agreed that no one else should quote on
its product.  It further agreed to pay Eaton, Rhodes &
Company  certain  commissions.  On the other hand,
Eaton, Rhodes & Company agreed to keep the coal com-
pany supplied with orders at good prices, to bill and col-
lect for the coke sold, and to guarantee payment of all
accounts.  In view of this explicit undertaking on the
part of the firm, it cannot be said that the contract im-
posed no obligation on them, and is, therefore, lacking in
mutuality. ' So long as the agency continued they were
bound to keep the coal company supplied with orders,
to bill and collect for all coke sold, and guarantee pay-
ment of all accounts. )

2.  It is next insisted that the contract was termina-
ble at the will of either party, and that the sale by the
company of its output for the year 1913 constituted a
revocation of the agency.  Of course, it cannot be con-
tended that the contract gave to the firm the perpetual
right to sell the coal company's output of coke so long
as the firm demonstrated its ability to handle the com-
pany's output in a satisfactory manner. ( Fairly con-
strued, the contract is one that could be terminated by
either party. ) Wilcox v. Ewing, 141 U. S., 637, 65 L.
Ed., 882.  There are cases holding that the authority
of the agent may be revoked not only in express terms,
but by implication from words and conduct of the prin-
cipal inconsistent with the continuation of the authority;
and where the principal has himself made a sale of the
subject matter of the agency, this of itself is sufficient to
constitute a revocation.  Wallace v. Figone, 107 Mo.
App., 362, 81 S. W., 492; Tiffany on Agency, pp. 134-5;
Hearn v. Baker, 34 Minn., 98, 24 N. W., 341; Farraday
Coal & Coke Co. v. Owens, 80 S. W., 1171; Miller v.
Ridder Lumber Co., 110 S. W., 869; 31 Cyc., 1302.  But
we take it that this rule is not one to be applied in every
case, regardless of the terms of the contract. / Here the
contract between the parties distinctly provides that the
coal company should not permit anyone else to quote on
its product so long as Eaton, Rhodes & Company were
able to demonstrate their ability to handle the product.'
Fairly construed, this was an undertaking on the part
of the coal company not to sell its product otherwise
than through Eaton, Rhodes & Company during the con-

tinuation of the agency. In this case the Ashland Iron & Mining Company was a customer of Eaton, Rhodes & Company. It was customary for such company to contract for its coke some months in advance. At the very time that the coal company began negotiations with the Ashland Iron & Mining Company for the sale to the latter of its ₖoutput of coke for the year 1913, Eaton, Rhodes & Company were engaged in like negotiations. The president of the Ashland Iron & Mining Company makes it clear that if the coal company had not quoted prices and contracted directly with his company, his company would have purchased its coke for the year 1913 through Eaton, Rhodes & Company. / We are not disposed, therefore, to hold, under the facts of this case, that the sale made by the coal company in violation of the terms of the contract was itself a revocation of the agency, and, therefore, deprived Eaton, Rhodes & Company of the commissions which they would have earned had it not been for such sale. On the other hand, we are clearly of the opinion that the contract was one that required notice of its termination before the coal company had the right to sell its coke direct.' The question whether or not such notice was given, and whether or not the coal company's action in quoting prices or selling coke to other persons deprived Eaton, Rhodes & Company of commissions which they would have earned but for such action on the part of the coal company, was fairly submitted to the jury, and we are unable to say that its finding is not fully supported by the evidence. Complaint is made of the fact that in the instructions given by the court the mere quoting of prices was a breach of the contract authorizing a recovery. In view of the fact, however, that the quoting of prices resulted in an actual sale, we are not inclined to regard this phase of the instructions as prejudicial to the substantial rights of the coal company.

Judgment affirmed.